IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LINWOOD W. PIERCE and          )
BRIDGET PIERCE,                )
                               )
          Plaintiffs,          )
                               )
     v.                        )          1:22-cv-1126
                               )
AMERON INTERNATIONAL           )
CORPORATION, B & W MECHANICAL  )
CONTRACTORS, INC., and         )
PERMA-PIPE, INC.,              )
                               )
          Defendants.          )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Plaintiff Linwood W. Pierce alleges that he was exposed to
asbestos and asbestos dust throughout his career as a welder and
pipefitter from the mid-1960s to 2013. (Compl. (Doc. 1) ¶ 34.)
After Mr. Pierce was diagnosed with Mesothelioma in 2021, Mr.
Pierce and his wife, Bridget Pierce, filed a complaint asserting
tort claims against various companies that manufactured, sold,
and distributed asbestos-containing products or raw asbestos
materials, primarily in North Carolina, during Mr. Pierce's
career. (Id. ¶¶ 7-8, 19, 32, 34.) Pending before this court is
Defendant Ameron International Corporation's Motion for Summary
Judgment, (Doc. 62). For the reasons stated herein, Defendant's
motion will be granted.

## I. FACTUAL BACKGROUND

### A. Mr. Pierce's Mesothelioma Diagnosis

Mr. Pierce was diagnosed with Mesothelioma in 2021. (Pls.'
Ex. 1, Dep. of Linwood Wayne Pierce on Feb. 23, 2022 ("Pierce
Dep. Feb. 23, 2022") (Doc. 65-1) at 10, 47.)[1] Mesothelioma is a
"malignant tumor resulting from neoplastic transformation and
uncontrolled growth of mesothelial lining cells." (Pls.' Ex. 18,
Expert Report of Arnold R. Brody, Ph.D. ("Brody Expert Report")
(Doc. 65-18) at 11). The only known environmental cause of
Mesothelioma is exposure to asbestos. (Id.) Asbestos fibers have
historically been used in a variety of commercial products.
(Pls.' Ex. 8, Dep. of Arthur L. Frank ("Frank Dep.") (Doc. 65-8)
at 12-13.) According to Plaintiffs' expert, Dr. Arthur L. Frank,
Mr. Pierce "had a variety of exposures" to asbestos "over time
in many settings" throughout his professional career. (Id. at
27.)

Mr. Pierce's career began in 1965 when he accepted a job
with a contractor in Burgaw, North Carolina, "mixing mortar and
moving block." (Pls.' Ex. 1, Pierce Dep. Feb. 23, 2022 (Doc. 65-
1) at 11.) In the years to follow, Mr. Pierce worked as a welder

---

[1] Citations in this Memorandum Opinion and Order to
documents filed within the court refer to the page numbers
located at the bottom right-hand corner of the documents as they
appear on CM/ECF.

and pipefitter, completing projects at various jobsites throughout North Carolina, as well in South Carolina, Virginia, and Maryland. (<u>Id.</u> at 11–34.)

**B.** **Mr. Pierce Avers He Installed Defendant Ameron's Products at Camp Lejeune**

In 1974, Mr. Pierce formed a company with his father, R&W Construction, and thereafter primarily worked on projects at Camp Lejeune and Cherry Point – military bases in eastern North Carolina. (<u>Id.</u> at 36, 49.) Mr. Pierce avers that while at Camp Lejeune he worked with "[a] lot" of Bondstrand pipe. (<u>Id.</u> at 36–37 ("[W]e used it for chilled water, hot water[, and] . . . jet fuel. . . . We ended up . . . replacing a whole lot of Camp Lejeune's condensate line with the Bondstrand.").) Mr. Pierce recalls that he installed "several miles" of it. (<u>Id.</u> at 38.) "Bondstrand is a brand name for multiple types of fiberglass-reinforced insulated resin pipe manufactured by Ameron." (Def.'s Ex. 3, Decl. of Ralph S. Friedrich ("Friedrich Decl.") (Doc. 63-3) ¶ 4.)

Notwithstanding Mr. Pierce's averment, the parties dispute whether the pipe Mr. Pierce installed at Camp Lejeune was in fact Bondstrand pipe. Mr. Pierce admits in a deposition that he uses "Bondstrand" as a "generic term," and that he does not actually know who supplied or manufactured the pipe he

- 3 -

installed. (Pls.' Ex. 2, Dep. of Linwood Wayne Pierce on March 15, 2023 ("Pierce Dep. Mar. 15, 2023") (Doc. 65-2) at 42; see also Pls.' Ex. 1, Pierce Dep. Feb. 23, 2022 (Doc. 65-1) at 37 ("It might have been different manufacturers with different names, but all of it -- we called it all 'Bondstrand.'").) Mr. Pierce never purchased the pipe directly from its manufacturer, and he cannot distinguish Ameron pipe from other companies' pipe on sight. (Pls.' Ex. 2, Pierce Dep. Mar. 15, 2023 (Doc. 65-2) at 43.) Rather, he "think[s]" the pipe that he installed at Camp Lejeune was manufactured by Ameron, because he "remember[s] hearing the name." (Id.)

Ralph Friedrich, an Ameron corporate representative, (Pls.' Ex. 5, Dep. of Ameron via Ralph Friedrich ("Friedrich Dep.") (Doc. 65-5) at 5), acknowledges that "[Ameron] sold an awful lot of pipe to [the] military for steam condensate return and for jet fuel lines," (id. at 13). However, during Friedrich's career with Ameron, he had no personal involvement with Camp Lejeune, (id. at 5), and he cannot confirm that Bondstrand pipe was ever

installed at Camp Lejeune, (id. at 12, 14).[2] Ameron does not possess sales records from the relevant era. (Id. at 6.) Likewise, Mr. Pierce does not possess project specs or other records detailing the work he completed at Camp Lejeune. (Pls.' Ex. 2, Pierce Dep. Mar. 15, 2023 (Doc. 65-2) at 11.)

Thus, at summary judgment, the factual record is devoid of direct evidence supporting Mr. Pierce's averment that he installed Bondstrand pipe. However, there is at least some circumstantial evidence in support of Mr. Pierce's recollection. Friedrich - in addition to acknowledging that Ameron sold an "awful lot" of Bondstrand pipe to the military - concedes in his deposition that Mr. Pierce's testimony about Bondstrand pipe was "generally fairly accurate" and that his description of how he

---

[2] When Mr. Friedrich was asked in his deposition whether he "intend[s] to say in this case that Ameron did not supply Bondstrand pipe to Camp Lejeune," Friedrich responds: "No. I think Ameron provided pipe that was qualified for the military specification." (Pls.' Ex. 5, Friedrich Dep. (Doc. 65-5) at 14.) Plaintiffs, ostensibly relying on Friedrich's statement, argue that "Ameron does not deny that it supplied Camp Lejeune [its products]." (Pls.' Resp. (Doc. 65) at 22-23.) Defendant replies that Friedrich's testimony only shows that "certain Bondstrand pipe manufactured by Ameron was qualified for potential specification on military projects," but that Friedrich had no personal knowledge of Bondstrand pipe being used at Camp Lejeune and thus cannot confirm its presence one way or the other. (Def.'s Reply (Doc. 66) at 5.)

In light of Friedrich's full testimony, this court does not view his statement as an express admission that Ameron supplied Bondstrand pipe to Camp Lejeune. However, as discussed infra Section IV.A., Plaintiffs have forecast sufficient circumstantial evidence to raise a triable issue on this fact.

installed the pipe at Camp Lejeune was "actually reasonably accurate." (Pls.' Ex. 5, Friedrich Dep. (Doc. 65-5) at 12-13, 21.)[3]

## C. __Ameron's Fittings Contained Asbestos__

Mr. Pierce avers that all the pipe-fitting work he performed at Camp Lejeune was done pursuant to project specifications issued by the U.S. Government. (Pls.' Ex. 2, Pierce Dep. Mar. 15, 2023 (Doc. 65-2) at 6.) During the era that Mr. Pierce worked at Camp Lejeune,[4] Ameron's Series 2000 Bondstrand pipe was the only type of Ameron pipe "approved for use under military specifications." (Def.'s Ex. 3, Friedrich Decl. (Doc. 63-3) ¶ 6.) Ameron's Series 2000 pipe did not contain asbestos. (Id.) However, during that same era, Ameron's "Series 4000 fittings and flanges were certified for military use." (Id. ¶ 7; see also Pls.' Ex. 5, Friedrich Dep. (Doc. 65-5)

---

[3] Mr. Pierce testified that the pipe was made of woven materials, "slick on the inside and rough on the outside," "[t]wo to six inches" thick, and black in color. (Pls.' Ex. 1, Pierce Dep. Feb. 23, 2022 (Doc. 65-1) at 37.) To install the pipe, Mr. Pierce would "dig out the side of [a] steam line and lay [the pipe] in." (Id.) He would sometimes cut the pipe with a bandsaw, which would give off "some dust," as well as "shave" the outside of the pipe and "put a fitting in it." (Id.; see also Pls.' Ex. 2, Pierce Dep. Mar. 15, 2023 (Doc. 65-2) at 8-9.)

[4] Mr. Pierce attests that he began installing Bondstrand pipe at Camp Lejeune sometime between 1976 and 1980. (See Pls.' Ex. 2, Pierce Dep. Mar. 15, 2023 (Doc. 65-2) at 8.)

at 17.) Ameron's Series 4000 fittings and flanges[5] did contain asbestos. (Def.'s Ex. 3, Friedrich Decl. (Doc. 63-3) ¶ 7.)

Mr. Pierce attests in his deposition that he used fittings during the pipelaying process at Camp Lejeune. Specifically, he attests that when he cut lengths of the Bondstrand pipe, he would then "shave" the pipe and "put a fitting in it." (See Pls.' Ex. 1, Pierce Dep. Feb. 23, 2022 (Doc. 65-1) at 37 ("[Y]ou . . . kept shaving [the pipe] down till it would fit on your fitting.").) However, while Mr. Pierce testifies that he would cut and shave Ameron's pipe, he does not testify to ever cutting or shaving Ameron's fittings.

Friedrich confirms that it was typical to use fittings in "a variety of places" when installing Bondstrand pipe: namely, fittings were used to connect pipe with valves and pumps, or to connect lengths of pipes with one another. (Pls.' Ex. 5, Friedrich Dep. (Doc. 65-5) at 12.) Friedrich testifies in his deposition that fittings would never get cut during the installation process. (Id.; see also Def.'s Ex. 3, Friedrich Decl. (Doc. 63-3) ¶ 7.) According to Friedrich, "[t]he only thing that happens to a fitting is to sand the female bell

_____

[5] Ralph Friedrich explains in his deposition that "a flange is actually considered a [type of] fitting." (Pls.' Ex. 5, Friedrich Dep. (Doc. 65-5) at 12.) Hereafter, when this court refers to "fittings," it is meant as an umbrella term encompassing both fittings and flanges.

before you put in the bonnet before you bond it." (Pls.' Ex. 5, Friedrich Dep. (Doc. 65-5) at 12.) However, "such light sanding would not reach the asbestos liner within the structural wall of the fitting or flange."[6] (Def.'s Ex. 3, Friedrich Decl. (Doc. 63-3) ¶ 7.)

The upshot, with regard to Ameron's asbestos-containing fittings, is that Ameron has put forward evidence (1) that their fittings would, at most, be lightly sanded during the installation process, and (2) that such sanding would not release asbestos. Although Plaintiffs have offered evidence to dispute the second point, see n.6, they have put forth no evidence that Mr. Pierce ever sanded, shaved, cut, or otherwise manipulated the fittings in a manner that would have released asbestos dust.

## II. **PROCEDURAL HISTORY**

Plaintiffs filed their complaint on December 22, 2022, (Compl. (Doc. 1)), asserting state law claims against various

---

[6] Plaintiffs have offered evidence to rebut this assertion by Friedrich and create a dispute of fact as to whether the sanding of Ameron's Series 4000 fittings released asbestos. (See Pls.' Ex. 14, Industrial Hygiene Study (Doc. 65-14) at 5-6, 10.) Plaintiffs cite to a 1977 "Industrial Hygiene Study," which found that the sanding of Ameron's fittings had the potential to release asbestos into the air. (Id. at 10.) During the study, the highest exposure of asbestos occurred when a fitting had been sanded and then was left "lying about for several days (or weeks)" to oxidize. (Id. at 5.)

companies, including Defendant Ameron International Corporation, that had "manufactured, sold, and/or distributed asbestos-containing products or raw asbestos materials" in states where Mr. Pierce worked as a welder and pipefitter, (id. ¶ 8). Defendant Ameron International Corporation filed an answer on January 26, 2023, (Doc. 18), and an amended answer on January 31, 2023, (Doc. 25). Following discovery, Defendant Ameron filed a motion for summary judgment on June 27, 2024, (Doc. 62), and a memorandum in support of its motion, (Mem. in Supp. of Def. Ameron International Corporation's Mot. for Summ. J. ("Def.'s Mem.") (Doc. 63)). Plaintiffs filed a response in opposition on August 7, 2024, (Pls.' Mem. in Opp'n to Def. Ameron International Corporation's Mot. for Summ. J. ("Pls.' Resp.") (Doc. 65)),[7] and Defendant Ameron replied on August 19, 2024, (Def. Ameron International Corporation's Reply Br. in Supp. of Mot. for Summ. J. ("Def.'s Reply") (Doc. 66)).

---

[7] As Defendant correctly notes in its reply brief, (see Def.'s Reply (Doc. 66) at 2-3), Plaintiffs filed a tardy response brief in this action, (see Pls.' Resp. (Doc. 65)), and made no showing to this court "of excusable neglect." See LR56.1(e) (allowing nonmoving party "30 days after service of the summary judgment motion and brief" to file a response); LR7.3(k) (explaining that a party's failure to file a timely brief "shall constitute a waiver of the right thereafter to file such brief or response, except upon a showing of excusable neglect"). Although Plaintiffs waived their right to file a response due to their tardiness, this court will exercise its discretion to consider Plaintiffs' late-filed response and decide this case on the merits.

## III. STANDARD OF REVIEW

### A. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This court's summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. If the "moving party discharges its burden . . . , the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718-19 (4th Cir. 2003) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). Summary judgment should be granted "unless a reasonable jury could return a verdict in favor of the nonmovant on the evidence presented." Id. at 719 (citing Liberty Lobby, 477 U.S. at 247-48). Finally, "in evaluating a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party."

<u>Perini Corp. v. Perini Constr., Inc.</u>, 915 F.2d 121, 124 (4th Cir. 1990).

**B.   <u>Choice of Law Analysis</u>**

"A federal court sitting in diversity is required to apply the substantive law of the forum state, including its choice-of-law rules." <u>Francis v. Allstate Ins. Co.</u>, 709 F.3d 362, 369 (4th Cir. 2013). North Carolina's "traditional conflict of laws rule is that matters affecting the substantial rights of the parties are determined by lex loci, the law of the situs of the claim." <u>Boudreau v. Baughman</u>, 322 N.C. 331, 335, 368 S.E.2d 849, 853–54 (1988). "For actions sounding in tort, the state where the injury occurred is considered the situs of the claim." <u>Id.</u> Here, Plaintiffs assert tort claims against Defendant Ameron that arise out of Plaintiffs' injuries in North Carolina. (<u>See</u> Compl. (Doc. 1) ¶¶ 9, 21.) Thus, Plaintiffs' claims are governed by North Carolina substantive law.

**IV.   <u>ANALYSIS</u>**

Plaintiffs allege that Mr. Pierce's "exposures to [Defendant Ameron's] products . . . caused or contributed to cause Plaintiff's disease and injury." (Compl. (Doc. 1) ¶ 21.) Plaintiffs assert claims against Ameron for defective design pursuant to N.C. Gen. Stat. § 99B-6, (<u>id.</u> ¶¶ 49–69), failure to warn pursuant to N.C. Gen. Stat. § 99B-5, (<u>id.</u> ¶¶ 70–74), breach

- 11 -

of implied warranty, (id. ¶¶ 75-80), gross negligence,[8] (id. ¶¶ 81-90), and loss of consortium, (id. ¶¶ 91-93).

Each of these tort claims requires Plaintiffs to prove the element of causation.[9] A dispositive question before this court, therefore, is whether a reasonable jury could find that Ameron's products were a direct and proximate cause of Mr. Pierce's Mesothelioma. (See id. ¶¶ 94-97.) Defendant contends that there is an absence of evidence in the record showing that Mr. Pierce was actually exposed to any asbestos-containing Ameron products, see infra Section IV.A., "let alone with the frequency, regularity, and proximity" that is required by law in order to

_____

[8] Under the "gross negligence" heading of their complaint, Plaintiffs additionally allege that they are entitled to punitive damages pursuant to N.C. Gen. Stat. § 1D-15(a). (Compl. (Doc. 1) ¶ 89.)

[9] See N.C. Gen. Stat. § 99B-6(a) (requiring proof of proximate cause); id. § 99B-5(a) (same); Goodman v. Wenco Foods, Inc., 333 N.C. 1, 10, 423 S.E.2d 444, 448 (1992) (explaining that plaintiff must prove "that damages were suffered as a result" of defendant's breach of implied warranty); Land v. Whitley, 292 N.C. App. 244, 255, 898 S.E.2d 17, 26, review allowed, 900 S.E.2d 662 (N.C. 2024) ("[A] claim for gross negligence requires that plaintiff plead facts on each of the elements of negligence, including . . . causation [and] proximate cause." (citation omitted)); Newman v. Stepp, 267 N.C. App. 232, 239, 833 S.E.2d 353, 358 (2019), aff'd, 376 N.C. 300, 852 S.E.2d 104 (2020) ("[A] loss of consortium claim is derivative in nature.").

find Ameron liable for Mr. Pierce's Mesothelioma, <u>see</u> <u>infra</u> Section IV.B. (Def.'s Mem. (Doc. 63) at 8.)

A. **Plaintiffs Have Forecast Circumstantial Evidence Showing the Pipe and Fittings Mr. Pierce Installed at Camp Lejeune Were Defendant Ameron's Products**

In cases arising from alleged asbestos exposure in North Carolina, a plaintiff first "must demonstrate that he was actually exposed to the alleged offending products." <u>Wilder v. Amatex Corp.</u>, 314 N.C. 550, 553-54, 336 S.E.2d 66, 68 (1985); <u>see</u> <u>also</u> <u>Smith v. Schlage Lock Co., LLC</u>, 986 F.3d 482, 487 (4th Cir. 2021) (collecting cases standing for the proposition that "North Carolina law requires actual exposure to asbestos"). "The Fourth Circuit has recognized that requiring direct evidence of product identification is unreasonable and that circumstantial evidence can instead be used to establish a plaintiff['] exposure to a specific product." <u>Foushee v. R.T. Vanderbilt Holding Co., Inc.</u>, 507 F. Supp. 3d 654, 659 (E.D.N.C. 2020), <u>aff'd,</u> No. 21-1074, 2023 WL 2888561 (4th Cir. Apr. 11, 2023).

Mr. Pierce avers that he installed Ameron's Bondstrand pipe and fittings at Camp Lejeune. However, Mr. Pierce concedes (1) that he uses "Bondstrand" as a generic term and that the pipe he installed may have come from different manufacturers, (2) that he cannot distinguish Ameron pipe from other companies' pipe,

- 13 -

and (3) that he does not actually know who manufactured the pipe he installed at Camp Lejeune. Neither Mr. Pierce nor Defendant Ameron possess sales records or project specs from the relevant era. Mr. Pierce "thinks" that the products he installed were manufactured by Ameron because he "remember[s] hearing the name." See supra Section I.B.

At summary judgment, Defendant argues that Plaintiffs "cannot base their claims of exposure to Ameron products solely on inadmissible hearsay received from an unnamed third-party supplier almost 50 years ago." (Def.'s Mem (Doc. 63) at 11.)[10] However, Plaintiffs' claims of exposure to Ameron's products do not rest solely on Mr. Pierce's testimony that he remembers hearing the name "Ameron." Rather, Plaintiffs have forecast circumstantial evidence of exposure in at least two other ways. First, Ameron's corporate representative, Friedrich, testified

_____

[10] "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "Hearsay" is a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." See Fed. R. Evid. 801(c). Here, Mr. Pierce's testimony that another individual uttered the name "Ameron" to him is hearsay evidence that may not be offered at trial for the purpose of proving that the pipe was, in fact, manufactured by Ameron. Because this evidence "is inadmissible at trial, [it] cannot be considered on [this] motion for summary judgment." See Lyons v. City of Alexandria, 35 F.4th 285, 290 n.4 (4th Cir. 2022) (quotation marks and citation omitted).

- 14 -

that Ameron sold "an awful lot" of Bondstrand pipe to the United States military. Second, and more critically, Friedrich acknowledged that Mr. Pierce's testimony about Bondstrand pipe was "generally fairly accurate," and that Mr. Pierce described with "reasonabl[e] accura[cy]" the process for installing Bondstrand pipe. (See Pls.' Ex. 5, Friedrich Dep. (Doc. 65-5) at 12, 21.)

Drawing reasonable inferences from this circumstantial evidence in the light most favorable to Plaintiffs,[11] a reasonable jury could conclude that Mr. Pierce installed Ameron-manufactured pipe and fittings at Camp Lejeune. At summary judgment, the evidence is not "so one-sided" that Defendant Ameron "must prevail" on the issue of actual exposure "as a matter of law." See Anderson, 477 U.S. at 251–52; see also Wilder, 314 N.C. at 553-54, 336 S.E.2d at 68 (finding plaintiff's forecast of evidence sufficient to survive summary judgment on the issue of actual exposure while heeding that, at

---

[11] It is unclear from the record to what extent Mr. Pierce's description of the pipe, and the process for installing the pipe, is unique to Ameron-manufactured products. Accordingly, it is unclear what probative weight should be attached to Mr. Friedrich's admission that Mr. Pierce's descriptions were "fairly" and "reasonably" accurate. However, at this stage, the court is required to draw reasonable inferences in favor of the nonmoving party; in doing so, it is reasonable to infer that Mr. Pierce's descriptions evince that the pipe he installed at Camp Lejeune was, in fact, Bondstrand pipe.

trial, "[i]t will not be enough for plaintiff simply to show that various products were shipped to various job sites on which he worked").

While a reasonable jury could conclude that Mr. Pierce installed Ameron's Bondstrand pipe and fittings at Camp Lejeune, it is undisputed by the parties that the only series of Bondstrand pipe approved for use at Camp Lejeune during the relevant era was free of asbestos. Rather, only Ameron's fittings contained asbestos. The question for this court that follows is whether Plaintiffs have forecast sufficient evidence for a reasonable jury to conclude that Mr. Pierce's exposure to Defendant Ameron's fittings was a proximate cause of his Mesothelioma.

B.    **Plaintiffs Have Failed to Forecast Evidence that Shows Exposure to Ameron's Fittings Was a Substantial Factor Causing Mr. Pierce's Mesothelioma**

To prove proximate cause, "North Carolina law requires a plaintiff in a tort action prove that exposure to a defendant's product was a substantial factor causing the plaintiff's injury." Finch v. Covil Corp., 972 F.3d 507, 512 (4th Cir. 2020); see also Jones v. Owens-Corning Fiberglas Corp. & Amchem Prods., Inc., 69 F.3d 712, 716 (4th Cir. 1995) ("[A] plaintiff in a personal injury asbestos case 'must prove more than a

- 16 -

casual or minimum contact with the product' containing asbestos in order to hold the manufacturer of that product liable." (citation omitted)). "To support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156, 1162–63 (4th Cir. 1986).[12] "Whether there is sufficient evidence in the record to satisfy [this] 'frequency, regularity, and proximity' test is a legal determination." Foushee, 507 F. Supp. 3d at 660 (collecting

---

[12] Although Lohrmann concerns an application of Maryland law, the Fourth Circuit has applied the same "frequency, regularity, and proximity" test, see Lohrmann, 782 F.2d at 1162–63, in asbestos cases decided under North Carolina law. See generally Jones, 69 F.3d 712; see also id. at 716 n.2. Here, both parties agree that the Lohrmann test is controlling. (See Def.'s Mem. (Doc. 63) at 9; Pls.' Resp. (Doc. 65) at 20–21.)

cases).[13]

Here, Plaintiffs forecast minimal evidence related to how frequently, regularly, and proximately Mr. Pierce was exposed to Ameron's fittings. Mr. Pierce avers in his deposition that he installed "several miles" of Ameron's Bondstrand pipe at Camp Lejeune. (Pls.' Ex. 1, Pierce Dep. Feb. 23, 2022 (Doc. 65-1) at 38.) The pipe came in 20-foot lengths. (Pls.' Ex. 2, Pierce Dep. Mar. 15, 2023 (Doc. 65-2) at 9.) During the installation process, Mr. Pierce would sometimes "cut [the pipe] and shave it and put a fitting in it." (See Pls.' Ex. 1, Pierce Dep. Feb. 23, 2022 (Doc. 65-1) at 37; Pls.' Ex. 2, Pierce Dep. Mar. 15, 2023 (Doc. 65-2) at 8-9.) When the pipe was not cut, the 20-foot lengths would be joined by "rough[ing] up" the outside of the male end of the pipe and attaching it, using glue, to the female

_____

[13] In Foushee, the court cites to a number of cases within this circuit that have applied Lohrmann. In the aggregate, those cases are instructive as to what evidence satisfies the "frequency, regularity, and proximity" test. For example, courts have found evidence of "daily exposure, multiple times each day, to visible dust from an asbestos-containing product over a five-month period" sufficient to overcome a defendant's summary judgment challenge. See Foushee, 507 F. Supp. 3d at 660 (citing Yates v. Air & Liquid Sys. Corp., No. 5:12-cv-752-FL, 2014 WL 4923603, at *22, *25 (E.D.N.C. Sept. 30, 2014)). However, where a plaintiff provides evidence of exposure only on "ten to fifteen occasions of between one and eight hours," or in "thirteen specific instances with missing information regarding the length of the exposures," or evidence that is too "vague and speculative" to determine how often a plaintiff was exposed, courts have found summary judgment for defendants warranted. See id. (citations omitted).

- 18 -

end of the next length of pipe. (Pls.' Ex. 2, Pierce Dep. Mar. 15, 2023 (Doc. 65-2) at 9.) Mr. Pierce attests that at Camp Lejeune the "buildings were close" together and thus "there was quite a bit of . . . cutting and joining." (Id. at 10.) However, he also acknowledges that the "goal" was always to install as much of the pipe as possible without making cuts. (Id. at 9.)

Based on Mr. Pierce's deposition testimony, it is reasonable to infer that he used Ameron's fittings at various points throughout the pipe installation process at Camp Lejeune, specifically when he would attach lengths of cut pipe. However, without more detail, this testimony allows only for speculation as to how frequently, regularly, and proximately he used fittings, which is insufficient "[t]o support a reasonable inference of substantial causation." Lohrmann, 782 F.2d at 1162–63; see also Connor v. Covil Corp., 996 F.3d 143, 153 (4th Cir. 2021) (holding that appellant failed to satisfy the Lohrmann test when plaintiff relied on mere speculation of exposure); Foushee, 507 F. Supp. 3d at 662–64 (granting summary judgment where plaintiff forecast evidence that the decedent was exposed to asbestos-containing products but "failed to forecast evidence sufficient to demonstrate the length of the exposures" (emphasis added)).

- 19 -

Plaintiffs argue summarily in their response brief that "fittings and flanges [were] necessary to connect the miles of piping that Mr. Pierce installed at Camp Lejeune," (Pls.' Resp. (Doc. 65) at 20), but Plaintiffs do not point to any "specific facts" in the record to support this contention. See McLean, 332 F.3d 718–19. As the nonmoving party at summary judgment, Plaintiffs "must rely on more than conclusory allegations" and "mere speculation." Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013).

Moreover, Plaintiffs have not marshaled any evidence showing that when Mr. Pierce did use Ameron's fittings during the pipelaying process, he cut, shaved, sanded, or otherwise manipulated those fittings in a manner that would have produced dust and released the asbestos contained within. Defendant's corporate representative, Friedrich, avers that Ameron's fittings had an "asbestos liner" located "within the structural wall." (Def.'s Ex. 3, Friedrich Decl. (Doc. 63-3) ¶ 7.) Plaintiffs do not rebut this fact. Friedrich additionally avers that "light sanding" of the fittings – which is the most that a fitting would ever need to be manipulated - "would not reach the asbestos liner." (Id.) Plaintiffs argue in response that "the sanding and shaving of the 4000 series flanges and fittings [would have] released 18.53 f/cc of asbestos." (Pls.' Resp.

(Doc. 65) at 23, 28-29 (citing Pls.' Ex. 14, Industrial Hygiene Study (Doc. 65-14)).) However, even if Plaintiffs have created a genuine dispute as to whether the sanding of Ameron's fittings releases asbestos, this dispute is not material in light of the factual record. That is, there is no evidence in the record that Mr. Pierce ever sanded, shaved, cut, or otherwise manipulated the fittings he installed.[14] Therefore, there is no basis for this court to infer that Mr. Pierce "breathe[d] in the asbestos dust" that the sanding of Ameron fittings might have produced. See Connor, 996 F.3d at 152 ("To satisfy the proximity prong of the Lohrmann test, Appellant need only establish that Mr. Connor was close enough to the Daniel International workers to breathe in the asbestos dust that their work produced.").

Plaintiffs' evidence at summary judgment fails to establish that Mr. Pierce experienced "more than a casual or minimum contact" with Defendant Ameron's asbestos-containing fittings. See Jones, 69 F.3d at 716 (citation omitted). "[B]ased on the

---

[14] Plaintiffs contend in their brief that "Mr. Pierce testified that he sanded and shaved fitting and flanges throughout the time that he installed Bondstrand pipe." (Pls.' Resp. (Doc. 65) at 20.) In making this argument, Plaintiffs do not cite to the record. And this court finds no support for this contention in the record. Rather, Mr. Pierce testified that he would cut and shave Ameron's pipe, (see Pls.' Ex. 1, Pierce Dep. Feb. 23, 2022 (Doc. 65-1) at 37; Pls.' Ex. 2, Pierce Dep. Mar. 15, 2023 (Doc. 65-2) at 8-9), which was asbestos-free, but did not testify to doing the same for Ameron's fittings.

- 21 -

extent of missing information, no reasonable jury could conclude from the evidence presented to this court that [Mr. Pierce] was exposed to [Ameron's fittings] with the necessary frequency, regularity, and proximity, such that it was the probable cause of [his] later development of mesothelioma." See Foushee, 507 F. Supp. 3d at 664. To find otherwise would require this court and a jury to speculate and assume (1) that Mr. Pierce's installation of "several miles" of Bondstrand pipe meant that he was also exposed to asbestos-containing Ameron fittings with frequency, regularity, and proximity, and speculate and assume (2) that Mr. Pierce manipulated those fittings in a manner that exposed him to asbestos dust. Neither of these facts are supported by evidence or reasonable inferences. Furthermore, even if each fact was supported by reasonable inference, the "building of one inference upon another" is insufficient to overcome a summary judgment challenge. See Dash, 731 F.3d at 311.

Because Plaintiffs have failed to forecast evidence to show that Defendant Ameron's fittings were a "substantial factor" in causing Mr. Pierce's Mesothelioma, see Finch, 972 F.3d at 512,

- 22 -

summary judgment for Defendant must be granted on all claims, see supra n.9.[15]

V.   **CONCLUSION**

For the foregoing reasons,

**IT IS THEREFORE ORDERED** that Defendant Ameron International Corporation's Motion for Summary Judgment, (Doc. 62), is **GRANTED**.

This the 1st day of July, 2025.

_____
United States District Judge

---

[15] Defendant Ameron additionally argues that Plaintiffs' claims must fail because Mr. Pierce was contributorily negligent. (Def.'s Mem. (Doc. 63) at 16-18.) Because this court finds that Plaintiffs have failed to forecast evidence sufficient to establish the dispositive element of causation, it declines to address Defendant's arguments related to contributory negligence.